AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
10038 2nd St. NW, Albuquerque, NM; StorWise Storage units N01, N40, N41, & N42, at 10130 2nd St. NW, Albuquerque, NM; and Leonard J. Lucero (born 1971)

Case No. **23mr8**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of New Mexico, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a), 846, 856 and 18 U.S.C. §§ 924(c) and 922(g) | possession with intent to distribute controlled substances; conspiracy; and maintaining drug involved premises; and possession of a firearm in furtherance of a drug trafficking crime; and being a prohibited person in possession of a firearm or ammunition. |

The application is based on these facts:

Refer to attached Affidavit in Support of an Application for a Search Warrant

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Bryan Acee, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by email and telephone *(specify reliable electronic means)*.

Date: _____

City and state: Albuquerque, New Mexico

*Judge's signature*

B. Paul Briones, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A
### Premises and Person to be Searched

SUBJECT PREMISES 1: **10038 2nd St. NW, Albuquerque, New Mexico 87114**[1] may be described as a single-story with brown siding and brown trim. The numbers 101 are posted on the front of the house near the front door. There is a white travel trailer and numerous vehicles parked in the driveway of the Subject Premises. The search of the Subject Premises shall include the entire residence, all outbuildings, storage containers and vehicles parked at, or in front of, the Subject Premises.[2] Color photographs are posted below.



SUBJECT PREMISES 2, 3, 4, AND 5: **StorWise Self Storage, 10130 2nd Street NW, Albuquerque, New Mexico 87114, units N01, N40, N41, and N42** may be described as individually numbered storage units within the commercial storage facility known as StorWise Self Storage. There is a large red and white sign in front of the business entrance. Each storage unit is individually marked with letters and numbers. Storage units N01, N40, N41, and N42 will be opened and all contents within those units will be searched.




---

[1] Official Bernalillo County property assessor records list the property address as 101 Sanchez Road NW, Albuquerque, NM 87114; however, LEONARD LUCERO's New Mexico driver's license, vehicle registration, and Google Maps list the address 10038 2nd Street NW, Albuquerque, NM 87114. Official law enforcement and state court records pertaining to LUCERO list both the Sanchez Road and 2nd Street addresses. FBI agents believe the two addresses are one in the same.

[2] Only vehicles parked at or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Attachment A

## ATTACHMENT A
## Premises and Person to be Searched

PERSON TO BE SEARCHED: **LEONARD JOHN LUCERO**, born in 1971, who appears in the photo below. Agents will collect a DNA sample from LUCERO via buccal swab.



BIOMETRIC ACCESS TO DEVICES: During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel **LUCERO** to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a. Any devices found at the premises, and
b. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
c. for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.
d. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the **LUCERO** state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Attachment A

**ATTACHMENT B**
**Items to be Seized**

**Items to be Seized:** All evidence, fruits, and instrumentalities of violations of: 21 U.S.C. § 841(a) possession with intent to distribute controlled substances; 21 U.S.C. § 846 conspiracy to distribute controlled substances; 21 U.S.C. § 856 maintaining drug involved premises; 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime; and 18 U.S.C. § 922(g) being a prohibited person in possession of a firearm or ammunition, include the following items:

1) Controlled substances, including cocaine; drug paraphernalia, scales, plastic bags, and other packaging materials;

2) Proceeds of drug distribution, to include United States currency and jewelry;

3) Firearms, magazines and ammunition;

4) Evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders money order receipts, pre-paid money cards such as MoneyPak, Green Dot, Wal-Mart, or other debit cards and any documents relating to transporting, ordering, purchasing or distributing drugs;

5) Cellular telephones;

6) Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

7) Safes, combinations or key-lock strong boxes or other secure storage containers, and types of locked or containers, and hidden compartments that may contain any of the foregoing.

8) DNA buccal swab from LEONARD JOHN LUCERO, born in 1971.

Attachment B

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

### INTRODUCTION

1. I, Bryan Acee, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises (hereinafter referred to as the "Subject Premises") and the person known as LEONARD JOHN LUCERO, born in 1971:

    a) 10038 2nd St. NW, Albuquerque, New Mexico 87114;[1]

    b) StorWise Self Storage unit #N01, 10130 2nd Street NW, Albuquerque, New Mexico 87114;

    c) StorWise Self Storage unit #N40, 10130 2nd St. NW, Albuquerque, New Mexico 87114;

    d) StorWise Self Storage unit #N41, 10130 2nd St. NW, Albuquerque, New Mexico 87114;

    e) StorWise Self Storage unit #N42, 10130 2nd St. NW, Albuquerque, New Mexico 87114;

    f) LEONARD JOHN LUCERO, born in 1971.

2. More detailed descriptions and photographs of the Subject Premises and Subject are contained within "Attachment A," which has been attached hereto and incorporated herein by this reference.

### PURPOSE OF THE AFFIDAVIT

3. The FBI Albuquerque Violent Gang Task Force (VGTF) has been engaged in the investigation of the Brew Town Locos (BTL) street gang for the past few years. Case agents have developed several informants within the gang and have arrested numerous members for armed drug trafficking, distribution of controlled substances, and unlawful possession of firearms. This affidavit is submitted in support of warrants to search the Subject and Subject Premises, which are believed to contain evidence of violations of:

    a) 21 U.S.C. § 841(a) possession with intent to distribute controlled substances;

---

[1] Official Bernalillo County property assessor records list the property address as 101 Sanchez Road NW, Albuquerque, NM 87114; however, LUCERO's New Mexico driver's license, vehicle registration, and Google Maps list the address 10038 2nd Street NW, Albuquerque, NM 87114. Official law enforcement and state court records pertaining to LUCERO list both the Sanchez Road and 2nd Street addresses. I believe the two addresses are one in the same and will use the 2nd Street address herein.

| Page 1

    b) 21 U.S.C. § 846 conspiracy to distribute controlled substances;

    c) 21 U.S.C. § 856 maintaining drug involved premises;

    d) 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime; and

    e) 18 U.S.C. § 922(g) being a prohibited person in possession of a firearm or ammunition.

The violations listed above shall be referenced as the "Target Offenses" hereinafter.

4. I am submitting this affidavit based upon my experience and familiarity with the instant investigation. This affidavit does not set forth all my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

    a) Information from Confidential Human Sources (CHS for both plural and singular);

    b) Information provided by law enforcement or corrections officials;

    c) Results of physical and electronic surveillance;

    d) Information derived from consensually recorded conversations;

    e) Records from the FBI National Crime Information Center, New Mexico Corrections Department, New Mexico Courts, and the New Mexico Motor Vehicle Division.

5. Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow agents, task force officers, detectives, intelligence analysts, institutional gang investigators, or CHS that assisted law enforcement.

### AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

6. I have been a law enforcement officer for 23 years, serving as a police officer, detective, task force officer and special agent. I have been with the FBI since 2009 and have primarily worked transnational organized crime, violent crime, and gangs. Over the past 22 years, I have arrested several hundred persons for offenses related to drug distribution, gang crimes, racketeering offences, firearm violations, homicide, armed robbery, carjacking, assault, and other crimes. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations (DTOs), and gang/criminal

enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations conceal the often substantial profits generated from their criminal activities.

7. I served as the lead FBI case agent in the government's 2010-2014 Continuing Criminal Enterprise Drug Kingpin Act case against the Cartel de Juarez (or Juarez Cartel), which resulted in extensive seizures of controlled substances, currency, firearms, and the indictment of multiple cartel leaders. Several cartel leaders were extradited to the United States. Other cartel leaders are pending extradition to the United States.

8. I am the lead case agent in the government's 2015-2022 gang racketeering case against the Sindicato de Nuevo Mexico (SNM) prison gang, which encompasses substantial drug trafficking activities, firearm-related offenses, and numerous homicides. To date, 170 SNM members and associates have been arrested and 12 gang related homicides were charged as federal racketeering murders.

9. I have qualified, in federal and state court, as an expert witness on drug trafficking, possession with intent to distribute controlled substances, and the Juarez Cartel. I have also qualified in federal court as an expert witness regarding firearms, ammunition, interstate nexus, and firearm possession as it relates to drug trafficking. I am an FBI subject matter expert on the Juarez Cartel and SNM.

10. I have served as an adjunct professor, law enforcement instructor, and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police, and Bernalillo County Sheriff's Office academies; as well as at training classes and seminars for the Organized Crime Drug Enforcement Task Force, California Narcotic Officers Association, California Gang Investigators Association, Southern California Outlaw Motorcycle Gang Task Force, International Outlaw Motorcycle Gang Task Force, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

### BACKGROUND ALLEGATIONS REGARDING GANGS AND DRUG TRAFFICKERS

11. Based upon my training, experience, and participation in this investigation, as well as the investigation of other gang/criminal enterprises and DTOs, I am aware of the following information:

   a) Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

   b) Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as is the case in the instant investigation). Incarcerated members of gang/criminal enterprises communicate via telephone calls, some of which are generated via third parties. In addition, incarcerated members often keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate others.

   c) I am aware gang members aggressively pursue informants, suspected informants, and persons who betray the gang(s). I am aware gang members relay such information to one another through covert communications, messages, emails, telephone calls, personal visits, letters, and mail disguised as "legal mail."

d) I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I am aware incarcerated members of gang/criminal enterprises utilize a non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood corrections officers will monitor the call.

e) I know that members and associates of gang/criminal enterprises and DTOs maintain stash houses, rental properties, apartments, storage units, and similar assemblies to store controlled substances and drug proceeds.

f) In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

g) Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

h) Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

i) Individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

j) I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the gang members and they are expected to possess and maintain firearms. I am aware members of DTOs often possess firearms to protect their drug supply and proceeds.

k) I know that fingerprints and DNA evidence may be transferred to drug packaging materials, firearms, and ammunition.

12. The items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences, stash houses, and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

**FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE**

13. **Background**: Over the past three years, FBI VGTF agents have been monitoring the activities of the BTL gang via social media, confidential human sources, cooperating defendants, and recorded jail/prison calls, among other methods. Over the course of the BTL gang investigation, agents executed search and arrest warrants on several members and associates of the gang, to include SUBJECT 1 and SUBJECT 2.

14. SUBJECT 1: In late 2020, VGTF agents arrested SUBJECT 1, an admitted BTL member, on federal drug and firearm violations. SUBJECT 1's cellular telephone was searched and SUBJECT 1 was interviewed, which enabled agents to identify many of SUBJECT 1's criminal associates. In 2022, SUBJECT 1 began cooperating with the government and provided additional information pertaining to the BTL, to include information about SUBEJCT 2. SUBJECT 1 told agents BTL members and associates work together to distribute drugs. SUBJECT 1 also confirmed BTL members obtain firearms from other BTL members and their associates, and utilize those firearms for protection.

15. SUBJECT 2: In 2022, VGTF agents arrested SUBJECT 2, a BTL associate and drug distributor, on federal drug and firearm violations. SUBJECT 2's cellular telephone was searched and SUBJECT 2 was interviewed, which enabled agents to identify many of SUBJECT 2's criminal associates. In December 2022, SUBJECT 2 began cooperating with the government and provided information on LEONARD JOHN LUCERO (hereinafter referred to as "LUCERO").

16. **The Current Investigation:** VGTF agents are currently investigating LUCERO, who is believed to be a Northside gang member and BTL associate. Intelligence information indicates LUCERO, age 51, is living at his parent's home (10038 2nd St. NW, Albuquerque) and involved in the unlawful distribution of firearms and controlled substances. SUBJECT 2 identified LUCERO as SUBJECT 2's source of supply for fentanyl tablets and firearms. SUBEJCT 2 explained the drugs and multiple firearms found on SUBJECT

2 at the time of SUBJECT 2's arrest had been supplied by LUCERO. SUBJECT 2 knows LUCERO to also sell heroin, methamphetamine, and firearms. SUBJECT 2 obtained drugs and/or firearms from LUCERO on numerous occasions. SUBJECT 2 told agents LUCERO maintained several storage units at a facility near LUCERO's home, where LUCERO kept firearms and drugs. SUBJECT 2 pointed out the storage units, LUCERO's residence, and identified LUCERO by photograph.

17. In late December 2022, a CHS reported LUCERO was in possession of numerous firearms and selling or trading them with various gang members in Albuquerque. The CHS also reported LUCERO was selling methamphetamine and fentanyl from his residence, storage unit, and vehicle (meaning LUCERO would deliver drugs to customers upon request). The CHS indicated LUCERO also stored stolen property inside the storage units, most of which LUCERO acquired from his drug clients as payment for drugs.

18. Withing the week, the CHS communicated with LUCERO and confirmed LUCERO had firearms to trade or sell. LUCERO told the CHS to come by his house anytime to conduct the transaction.

19. On December 29, 2022, VGTF agents confirmed LUCERO was renting four storage units at Storwise Self Storage, located at 10130 2nd Street NW, Albuquerque. This location is only a few hundred feet from LUCERO's residence. Storwise management confirmed LUCERO was renting units N01, N40, N41, and N42.

20. LUCERO's adult son resides at the Subject Premises; however, jail records indicate he is currently incarcerated at the Bernalillo County Metropolitan Detention Center (MDC) in Albuquerque. A defense attorney, who represents a cooperating defendant in the VGTF's ongoing investigation of the BTL, recently provided the following photograph to the government, which is from LUCERO's son's Facebook page:



21. I am unable to say for certain if the numerous firearms depicted in the photograph above are at the Subject Premises; however, I am aware of the fact that no firearms were recovered in relation to the arrest of LUCERO's son (who remains in custody at MDC on several felony charges). Therefore, I believe the firearms depicted in the photograph could be at the Subject Premises.

### THE SUBJECT PREMISES

22. Subject Premises 1: **10038 2nd St. NW, Albuquerque, New Mexico 87114**, which is also identified as 101 Sanchez Road NW, Albuquerque, NM 87114 (see footnote 1 on page 1), may be described as a single-story with brown siding and brown trim. The numbers 101 are posted on the front of the house near the front door. There is a white travel trailer and numerous vehicles parked in the driveway of the Subject Premises. Color photographs of the location have been included in Attachment A.

23. Subject Premises 2-5: **StorWise Self Storage, 10130 2nd Street NW, Albuquerque, New Mexico 87114, units N01, N40, N41, and N42** may be described as individually numbered storage units within the commercial storage facility known as StorWise Self Storage. There is a large red and white sign in front of

the business entrance. Each storage unit is individually marked with letters and numbers. Color photographs of the location have been included in Attachment A.

## THE TARGET SUBJECTS

24. LUCERO has at least twelve prior arrests in New Mexico with three felony convictions and two domestic violence misdemeanor convictions, all of which prohibit him from possessing a firearm or ammunition. Details pertaining to the convictions follow:

   a) possession of a controlled substance (originally charged as trafficking a controlled substance), Bernalillo County Case No. D-202-CR-2013-5031;

   b) possession of a controlled substance (originally charged as trafficking a controlled substance), Bernalillo County Case No. D-202-CR-2012-5000;

   c) possession of a controlled substance (originally charged as felon in possession of a firearm), Bernalillo County Case No. D-202-CR-2012-0250;

   d) misdemeanor domestic violence battery, Bernalillo Co. Case No. T-4-DV-2007-3262;

   e) misdemeanor domestic violence battery, Bernalillo Co. Case No. T-4-DV-2007-3262;

## DNA EVIDENCE COLLECTION

25. I am requesting the Court's permission to collect DNA buccal swabs from LUCERO to compare to the firearms seized from SUBJECT 2, as well as any drug packaging materials or firearms collected during the execution of the requested search warrants. I am aware the FBI Laboratory requires side-by-side comparisons of evidence and DNA in cases involving known subjects, such as in the instant investigation. I know DNA evidence may easily be transferred to drug packaging materials and firearms. I have utilized such DNA evidence in prior investigations and during jury trials.

## BIOMETRIC ACCESS TO DEVICES

26. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, offer their users the ability to unlock the device through biometric features in lieu of a numeric or

alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

27. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

28. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

29. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

30. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by

entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

31. As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

32. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, is inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device may exist for only a short time.

33. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target Subject to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of the Target Subject and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of the Target Subject and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by

this warrant. The proposed warrant does not authorize law enforcement to request that the Target Subject state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask the Target Subject to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

34. Based on the aforementioned information, I submit that probable cause exists to search the Subject Premises and Target Subjects, described in Attachment A, for the items described in Attachment B, which are evidence, fruits, and instrumentalities of, or property designated for use, intended for use, or used in committing violations of 21 U.S.C. §§ 841(a), 846, 856 and 18 U.S.C. §§ 922(g) and 924(c). This affidavit has been reviewed by Assistant United States Attorney Paul Mysliwiec, of the District of New Mexico.

Respectfully submitted,

Bryan Acee
FBI Special Agent

Electronically submitted and telephonically sworn to before me on January __3rd__ , 2023.

The Honorable B. Paul Briones
United States Magistrate Judge
District of New Mexico

| Page 13